J-S29008-16

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| WESLEY TUCKER, | |
| Appellant | No. 882 WDA 2015 |

Appeal from the Judgment of Sentence October 10, 2014
In the Court of Common Pleas of Westmoreland County
Criminal Division at No(s): CP-65-CR-0000449-2012

BEFORE:  BENDER, P.J.E., PANELLA, J., and FITZGERALD, J.[*]

MEMORANDUM BY BENDER, P.J.E.:                **FILED JUNE 1, 2016**

Appellant, Wesley Tucker, appeals from the judgment of sentence of an aggregate term of 11½ - 34 years' incarceration, following his conviction for rape and related offenses.  After careful review, we vacate Appellant's aggregate sentence and remand for resentencing consistent with this memorandum.

The trial court summarized the facts adduced at trial as follows:

> The charges in this case arose from an incident that occurred on or about January 11, 2012, in Jeannette, Westmoreland County. The testimony at trial established that the victim, JS, was asleep at her residence on Margaret Street, Jeannette, Pennsylvania, at approximately 2:00 a.m. when she heard a knock at her bedroom window.  JS ignored the knocking, but shortly thereafter, received a phone call on her cell phone from [Appellant], the husband of her close friend.  [Appellant]

_____

[*] Former Justice specially assigned to the Superior Court.

had arrived at JS' residence after being involved in a physical altercation at his residence with a friend of his earlier that evening. [Appellant] lived approximately two blocks from JS' apartment. JS testified that she allowed him into the residence and smelled alcohol on him. JS' young son, who was sleeping at the time [Appellant] arrived at the apartment, was also at the residence. After entering her apartment, JS testified that she and [Appellant] sat on the couch in the living room, talking. At some point, JS indicated that her back was itchy and [Appellant] scratched her back. JS testified that when [Appellant] tried to go under her shirt, she began to feel uncomfortable. She excused herself to her bedroom to check her cell phone to "get away from him for a couple of seconds." There, she saw that [Appellant]'s wife, Renita Smith, had texted her phone, asking if she had seen [Appellant]. JS testified that she called out into the living room saying his wife was looking for him. [Appellant] then approached the bedroom door and asked if he could use her cell phone because his had died. After using the cell phone, he put her phone in his pocket.

JS testified that she was sitting on the edge of the bed when [Appellant] said to her that she was "going to experience what it's like to be raped" and began to choke her. JS testified she was terrified and lost control of her bladder. He stopped choking her and she collapsed on the floor. JS began sobbing and had trouble catching her breath. She stood up and walked the length of the bed and he met her at the end of the bed. JS testified that he began choking her again, when her young son woke up and was standing directly behind [Appellant] as he was choking her. [Appellant] stopped and told her son that "it was adult time and to go wait in the living room." JS went into the bathroom to get a drink of water because her throat was burning and [Appellant] followed her into the bathroom. [Appellant] told JS to take off all of her clothes. JS testified she "begged him to please don't do this." [Appellant] threatened if she "wanted to keep my son alive that I would take all my clothes off and go lay on the bed." She testified that she did as instructed "out of complete fear for my life and my son's life." She testified that [Appellant] then pulled his pants down, got on top of her, had sexual intercourse with JS and ultimately ejaculated inside of her. Thereafter, he pulled his pants up, tossed her phone on her bed and left the bedroom. She put on pajama pants and a t-shirt. She followed him "because I didn't want him alone in the same room as my son." [Appellant] told her[,] "Don't tell

anybody[,]" and she responded that she wouldn't and she would see him on Saturday for her birthday. JS testified that photographs taken of her injuries, which were entered into evidence without objection, accurately depicted her injuries after the attack by [Appellant]. JS testified that she did not consent to the sexual intercourse with [Appellant].

JS did not immediately tell anyone about the assault. JS testified that she had family members that lived next to her. She testified that [she] wanted to be as "normal as I could" for her young son who was to attend afternoon kindergarten that day. She testified that she made her son breakfast, gave him a shower and watched cartoons with him in the morning. JS did not call the police, nor did she tell [Appellant]'s wife, who had texted her again later that morning. JS testified that she did not call the police because [Appellant] and his wife lived so close to her residence "they would have known if there was a police car at my house."

Thereafter, after taking her son to his afternoon kindergarten, JS went to see Angela Smail, the paternal grandmother of her son, who was working nearby in Jeannette at a bar. Angela Smail testified that JS had "choke marks on her neck" and that "all the little blood vessels in her face were broken" and "her eyes were like real red like they were bleeding almost." Ms. Srnaíl testified that JS told her that she had been attacked by [Appellant]. Concerned that she needed medical treatment, Ms. Smail took JS to Westmoreland Hospital.

Officer Justin Scalzo of the Jeannette Police Department testified that he was dispatched on January 11, 2012 at approximately 5:00 p.m. to Westmoreland Hospital to respond to a reported sexual assault. Officer Scalzo testified that when he first met JS he noticed a "large amount of swelling and redness around her neck, redness underneath her eyes" and "her eyes were both full of blood." Officer Scalzo testified that he spoke with JS and she "explained to me […] that she had been raped by a person that was known to her. She explained to me the incident." JS identified [Appellant] as the person who assaulted her. Katherine Anderson, a registered nurse at the Westmoreland Hospital emergency department and certified to give sexual assault examinations, testified that, on January 11, 2012, she was working in the emergency room at Westmoreland Hospital when she was summoned to conduct a sexual assault examination of a sexual assault victim, JS. Ms. Anderson

testified that, upon examination, JS had "facial injuries where her face from her neck up had the petechia." She testified that it was documented in the chart that she had a "red mark on her neck" and her eyes were "like a sclera hemorrhage had occurred." She also noted in her report that the "tongue is bitten on each side by the patient while being [shaken]." JS told Ms. Anderson that she had been choked in her apartment to the extent that she almost "passed out, she almost vomited. She urinated on her bedding." JS identified [Appellant] as "being the person that choked her. [Appellant] was the person who stated that she had to get undressed or he would hurt her family and her." Ms. Anderson noted in her report that there was "vaginal penetration only" and that he "ejaculated one time." Ms. Anderson testified that "there was concern about the soft tissue, her neck, her throat. She was having difficulty swallowing so Dr. Pifferetti was one of the doctors that came in because it was just sore. It was a deep soreness." Dr. Thomas Pifferetti, an emergency room doctor at Westmoreland Hospital, testified that he was working in the Westmoreland Hospital's emergency room on January 11, 2012, when JS presented with "conjunctival hemorrhages of both of the whites of the eyes and what we refer to as petechia, small red spots that were found on the cheeks and on the face." Dr. Pifferetti also noted that she had a "little bit of abrasion and some swelling of the tongue on both sides." Dr. Pifferetti testified that JS stated that "roughly about 12 hours earlier she had been sexually assaulted and physically assaulted in the sense that she had been choked as part of sexual assault." Dr. Pifferetti opined that the injuries he observed on JS were consistent with what JS told him had happened to her earlier that evening, and that the injuries were consistent with being choked.

After speaking with JS at Westmoreland Hospital, Officer Scalzo went to [Appellant]'s place of employment to perform an arrest, but learned he had left earlier that day. Officer Scalzo went to [Appellant]'s residence with six or seven other police units. The officers believed that [Appellant] was at home, as his vehicle was parked in front of his house. Officers knocked at the door, made verbal commands and had 911 operators call his cell phone number to try to get him to come out of the house for approximately 25 minutes. [Appellant] did not come out of his residence, but eventually came to the police station at approximately 10:30 p.m. Officer Scalzo testified that he conducted an interview with [Appellant] after he signed a waiver

of rights form. Officer Scalzo testified that he asked [Appellant] a series of questions regarding JS. Officer Scalzo asked whether he had seen JS earlier that morning and [Appellant] answered, "No." When asked whether [Appellant] was at JS' apartment earlier that morning, [Appellant] answered, "No." When asked when the last time that he was at her apartment or spoke to her, [Appellant] replied that he "did not remember." However, after [Appellant] learned that he was being implicated by the victim in a rape, he began to answer as if answering a hypothetical question, by indicating that if I did talk to JS, I don't remember and if I was at her house, I don't remember. Ultimately, Officer Scalzo indicated to [Appellant] that there was DNA evidence collected and [Appellant] answered by stating that he did not have sex with her, but if he did, it would be consensual.

Detective Raymond Dupilka of the Westmoreland County District Attorney's Office testified that he took photographs of injuries sustained by JS, took photographs of JS' residence and gathered evidence from her residence including bath towels and a washcloth and a pair of pajama bottoms. Sabine Panzer-Kaelin, a Forensic DNA Scientist 2 at the Pennsylvania State Police DNA Laboratory, was qualified, without objection, as an expert in DNA profiling, and testified regarding the DNA testing she performed in this case. She testified that she had four vaginal swabs from JS, a buccal swab from [Appellant], a buccal swab from JS, as well as a cutting from the crotch area of pajama pants. After reviewing the results, Ms. Panzer-Kaelin testified that the chance of the DNA from the vaginal swabs belonging to someone else other than [Appellant] was "approximately 1 in 1.4 quintillion from the Caucasian population, approximately 1 in 4.8 quintillion from the African American population and approximately 1 in 1.7 quintillion from Hispanic population."

In contrast to the Commonwealth's evidence, [Appellant] testified that he and the victim had consensual sexual intercourse and that he never threatened or assaulted her. [Appellant] testified that on the evening in question, he had been drinking with some of his friends, celebrating a friend's promotion at work. [Appellant] testified that "we all hung out doing a lot of drinking." Ultimately, he got into an altercation with a friend of his, Mike Thomas, over Mr. Thomas' girlfriend's shoes. The confrontation became physical and [Appellant] testified that he walked away to "cool off" and ended up at JS' house, walking around, around 2:15 a.m. [Appellant] testified

that he didn't "want to keep walking around at 2:00 a.m. while drunk." According to [Appellant]'s testimony, he knocked at JS's door, then knocked on her window and then called or texted her. Upon entering the apartment, [Appellant] testified that he went into JS' living room, where they sat on the couch, talking about the altercation. [Appellant] testified that JS stated that it was "cool" that he punched Mike because she "personally didn't like the guy" and JS was "kind of excited that actually we had gotten into an altercation." [Appellant] testified that JS asked him to scratch her back, lifting her shirt, indicating that she was itchy due to psoriasis. [Appellant] testified that she began showing him the areas of her body affected by the psoriasis, including her back, breasts and legs. [Appellant] testified that, thereafter, JS went into her bedroom and called him into the bedroom, telling [Appellant] that his wife had texted her and asked him if "he would rather stay." [Appellant] testified that JS already had her shirt off and then removed what he characterized as "cheerleader shorts" and she got into the bed and "they ended up having intercourse," [Appellant] testified that he never had his hands around her throat, never threatened JS and she never told him to stop. [Appellant] also indicated that her son was in the bedroom, but when he entered the bedroom, "she sent him out." [Appellant] testified that he never observed hemorrhaging in the eyes or broken blood vessels in JS' face. [Appellant] also testified that JS did not urinate on the bed and he did not see any indication of urination. [Appellant] testified that JS told him during intercourse that she was on birth control, known as Mirena, and that it was "okay to ejaculate in her." [Appellant] acknowledged that he and JS had sexual intercourse. [Appellant] testified that he did not initially admit to having sexual intercourse with JS because he "just had been unfaithful to his wife."

However, on cross examination, [Appellant] admitted that when originally questioned by the police, he had denied that he had seen or had spoken to JS on January 11, 2012 and testified that he had lied to the police.

…

Renita Smith, [Appellant]'s wife, also testified on [Appellant]'s behalf. Ms. Smith testified that in January of 2012, she and JS had known each other for approximately 10 years and were "best friends." She testified that she and JS would talk or text each other daily. She testified that JS lived in "like a

duplex" and that she resided there with "her mother, her grandmother, her uncle, her sister, her brother-in-law and her nieces and nephews along with her son."  Ms. Smith indicated that on January 10, 2012, her husband had some of his co-workers over and "they were having drinks and hanging out."  Ms. Smith indicated that she went to bed "about ten."  Ms. Smith testified that she woke up to her husband having an altercation with his friend, Mike, and after the altercation, [Appellant] left the residence.  Ms. Smith testified that she began to get worried about her husband's whereabouts, so she texted JS that night.  Ms. Smith testified that JS did not respond.  Ms. Smith indicated that she and JS texted repeatedly the next day and JS never told her [Appellant] had been at her house.  Ms. Smith also indicated that she accompanied her husband to the police station later that evening, that she was instructed by Officer Scalzo to stay in her car until he was finished talking to [Appellant] and that she did as instructed.

Trial Court Opinion (responding to Appellant's post-sentence motions), 7/27/2015, at 1-10.

Appellant was charged by criminal information with rape, aggravated assault, terroristic threats, indecent assault, unlawful restraint, and simple assault.[1]  Following a jury trial held on July 7-9, 2014, Appellant was acquitted of aggravated assault, but convicted of all the remaining, aforementioned offenses.  On October 10, 2014, the trial court sentenced Appellant to consecutive sentences of 10-20 years' incarceration for rape, 4-60 months' incarceration for terroristic threats, 6-24 months' incarceration for indecent assault, 4-60 months' incarceration for unlawful restraint, and

---

[1]  18 Pa.C.S. §§ 3121(a)(1), 2701(a)(1), 2706(a)(1), 3126(a)(1), 2902(a)(1), and 2701(a)(1), respectively.

4-24 months' incarceration for simple assault. Thus, Appellant was sentenced to an aggregate term of 11½-34 years' incarceration.

Appellant filed timely, post-sentence motions, and was granted leave to file supplemental/amended post-sentence motions.[2] Ultimately, Appellant's post-sentence motions were denied on April 30, 2015. Appellant thereafter filed a timely notice of appeal. Appellant then filed a timely, court-ordered Pa.R.A.P. 1925(b) statement on June 26, 2015. On July 27, 2015, the trial court issued a Rule 1925(a) statement, addressing new issues raised for the first time in Appellant's Rule 1925(b) statement, and incorporating its opinion addressing Appellant's post-sentence motions for the remaining claims. *See* Rule 1925(a) Opinion (hereinafter, "1925(a) Opinion"), 7/27/15, 1-6.

Appellant now presents the following questions for our review:

1. Did the trial court err by not applying the merger doctrine to [Appellant]'s sentence since the count of [i]ndecent [a]ssault was a lesser-included offense of the count of [r]ape?

2. Should [Appellant] be resentenced since the [s]entencing [c]ourt was exposed to prejudicial information regarding separate and unrelated charges of criminal activity that have been file against [him]?

3. Is [Appellant]'s sentence manifestly unreasonable and excessive?

Appellant's Brief, at 4.

---

[2] Appellant changed counsel twice during the post-sentence phase of the trial court's proceedings.

Appellant's first claim concerns whether his sentences for rape and indecent assault should have merged. "[M]erger is a nonwaivable challenge to the legality of the sentence. The issue is a pure question of law, allowing for plenary review." *Commonwealth v. Robinson*, 931 A.2d 15, 24 (Pa. Super. 2007) (citation omitted).

> No crimes shall merge for sentencing purposes unless the crimes arise from a single criminal act and all of the statutory elements of one offense are included in the statutory elements of the other offense. Where crimes merge for sentencing purposes, the court may sentence the defendant only on the higher graded offense.

42 Pa.C.S. § 9765.

Appellant argues that his rape and indecent assault sentences merge for sentencing purposes, citing *Commonwealth v. Lomax*, 8 A.3d 1264 (Pa. Super. 2010). In that case, this Court found that all the statutory elements of indecent assault are included in the statutory elements of rape, and that both offenses in that case had arisen from the same criminal act, the touching of the victim's genitals. Therefore, we held that Lomax's convictions for rape and indecent assault merged for sentencing purposes. *Id.* at 1268.

The trial court addressed Appellant's merger claim as follows:

> A careful review of the testimony at trial in this instant case reveals only a single physical act, the forcible intercourse. Thus, the court is constrained to agree that merger is appropriate in the circumstances of this case, and the sentence should be corrected accordingly.
> …

- 9 -

> As such, the court believes the sentence should be vacated and the matter remanded for resentencing by this court.

1925(a) Opinion, at 5-6.

The Commonwealth, however, contends that the indecent assault charged in this case occurred "prior to the rape when [Appellant] attempted to put his hand under the victim's shirt. Subsequently, after some period of time passed, [Appellant] forcibly raped the victim." Commonwealth's Brief, at 7. To support this assertion, the Commonwealth cites pages 41-42 of the trial transcripts. However, there are two trial transcripts in this case (A and B), and both contain those page numbers. Nevertheless, after reviewing those pages in *both* transcripts, we did not discover any mention of the "touching" that allegedly formed the basis of the separate indecent assault charge. *See* N.T.(A), 7/7/14 - 7/9/14, at 41-42 (direct examination testimony of J.S.); N.T.(B), 7/7/14 - 7/9/14, at 41-42 (cross-examination testimony of J.S.).

On page 40 of the trial transcript "A," J.S. does testify that she allowed Appellant to scratch her back until she "felt uncomfortable whenever he tried to go under my shirt." N.T.(A), at 40. However, there are multiple problems with ascribing this action as the basis of the indecent assault. First, J.S. was describing how consensual contact ended. Second, the language used by J.S. indicates that whatever contact was intended had not occurred. Third, J.S. did not indicate what part of her body was touched without her consent.

- 10 -

Most importantly, however, no mention of this act was contained in the Affidavit of Probable Cause or the Criminal Complaint. *See* Criminal Complaint, 1/12/12, at 1-13; Affidavit of Probable Cause, 1/12/12, at 1-3. Indeed, in the Criminal Complaint, the indecent assault offense was described as such:

> In that, on or about said date 1-11-2012 the defendant, Wesley Tucker, did have indecent contact with the victim or cause[d] the victim, namely, [J.S.,] to have indecent contact with him or her when the defendant did so by forcible compulsion, that is to say the defendant did by forcible compulsion force the victim to have vaginal [intercourse].

Criminal Complaint, at 4.

Less informative is the Criminal Information. The Criminal Information's description of the indecent assault charge is boilerplate language which does not describe the conduct that formed the basis of the offense. *See* Criminal Information, 2/24/12, at 1 ("The Actor had indecent contact with the complainant, [J.S.], or caused the complainant to have indecent contact with the Actor, without the complainant's consent.").

After careful review, we conclude that the record supports the trial court's determination that Appellant's rape and indecent assault convictions were based on the same criminal act: the forcible intercourse that occurred. Moreover, in such circumstances, rape and indecent assault merge for

sentencing purposes. ***Lomax***, ***supra***. Thus, we vacate Appellant's aggregate sentence and remand for resentencing.[3]

Because of our disposition with regard to Appellant's merger claim, we decline to address his third claim (asserting the manifest unreasonableness and excessiveness of his sentence), as that claim is rendered moot by our decision vacating his aggregate sentence.

Appellant's second claim concerns the trial court's consideration, at sentencing, of an unresolved sexual assault case against Appellant, which Appellant believes called into question the impartiality of the trial court. To the extent that Appellant challenges the discretionary aspects of his sentence when he asserts that the trial court considered an improper factor at sentencing, that issue is also rendered moot by our decision today. To the extent that Appellant asserts that the trial court should have recused itself at sentencing, or to the extent he requests that we create a rule that, "in situations where a defendant is facing multiple unrelated cases, the risk of prejudice is so great that the trial and/or sentencing should be handled by a jurist who is not aware of the pending unrelated counts[,]" we deem this

_____

[3] "If our disposition upsets the overall sentencing scheme of the trial court, we must remand so that the court can restructure its sentence plan." ***Commonwealth v. Thur***, 906 A.2d 552, 569 (Pa. Super. 2006). Here, Appellant was sentenced to consecutive sentences at each count. Accordingly, we conclude that, by vacating Appellant's sentence for indecent assault, we have substantially changed the total time in jail which the trial court imposed; thus, this Court has upset the sentencing scheme of the trial court.

claim waived for purposes of the instant appeal. Appellant's Brief, at 13. Appellant does not direct our attention to where in the record he preserved this claim, or otherwise requested recusal on this basis, and "[i]ssues not raised in the lower court are waived and cannot be raised for the first time on appeal." Pa.R.A.P. 302(a). As the trial court notes:

> [I]f [Appellant] believed that the trial court was biased when it imposed its sentence, the proper practice is to address an application for recusal by petition to the judge. **Commonwealth v. Whitmore**, 590 Pa. 376, 386, 912 A.2d 827, 834 (2006). [Appellant] failed to do so. Further, [Appellant] did not raise this issue at the time of sentencing, did not raise it in written post-sentence motions or amend post[-] sentence motions before the trial court, nor was it raised orally at the time of the post[-]sentence motions hearing on April 17, 2015. Accordingly, the issue is waived. Rule 302(a), *supra*.

1925(a) Opinion, at 4.

We agree. Thus, as to the issue of recusal, or the request for a new recusal rule for trial court judges who are ostensibly tainted by their knowledge of unrelated pending cases, we deem Appellant has waived any such claim by failing to preserve it below.

Judgment of sentence **vacated**. Case **remanded** for resentencing consistent with this memorandum. Jurisdiction **relinquished**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: June 1, 2016

- 13 -